Good morning, Your Honors, and may it please the Court. My name is Costu Valdas, and I'm here on behalf of the petitioner, Mr. Newman Aden. I'd like to reserve two minutes for rebuttal. What time do you have on the clock? There are three reasons why this Court should reverse the BIA and find Mr. Aden eligible for withholding of removal and eligible for asylum. First, Mr. Aden suffered past persecution and is thus eligible for withholding of removal and also eligible for asylum. Second, the IJ did not base her credibility determinations on specific cogent reasons, which had a nexus... Well, let's assume that we believe everything that Mr. Aden says. One indication is that this was persecution. He was caught in a civil war. His house got blown up. We don't quite know by whom or why. And what else is there? Your Honor, the testimony on the record and also in his declaration is that his house was attacked by Hawaiian Klansmen who were associated with the United Somali Congress. This Court has... But was it on account of his political opinion? It was on account of his belonging to the Madhavan, which is a sub-Klan of the Mi'ktaq. How does he know that? Where does he say that? Your Honor, he says that on AR-167, he says that the attackers knew him personally because they were his neighbors. And where does he say, and they did it because of his political affiliation? Not his political affiliation, Your Honor. Okay, because he was... Because he was a Madhavan native. Where does he say that? I mean, they might have done it because he was in the way. They might have done it because... I mean, he was in the middle of a civil war. People get hurt in a civil war. Houses get The casualties happen, you know, what they call collateral damage. Not to make light of the term, but basically people who are not aligned with either side simply get hurt or killed because they are in the way. Where does he show a connection between what happened to him and an imputed political belief or his status as a Klansman? Where does he show that? Your Honor, there's two places where he discusses that. One is when he's expressly asked whether they attacked him because he was Madhavan. How did they know he was Madhavan? He says that they knew which clan I belonged to because they were my neighbors. He also talks about... Is this 167? Yes, Your Honor, I believe. There are two numbers on the page. You're not talking about ER-167, are you? Yes, I'm talking about... Page 68 of the transcript. Yes. Okay, why don't you tell me which lines you're reading. Anyway, lines 16 through 20. Okay. Anyway, sir, when you and your family were attacked in Mogadishu, were they calling out your name or were they just attacking the home because it was in the neighborhood that held minority groups? They knew us because we used to be neighbors. And that response there is indicative of the fact that he's saying that they knew who they were because they were his neighbors. Well, but he doesn't answer the question of whether that's why they were being attacked. Your Honor, he also later on talks about the fact that... I mean, the house would be... He said, were they attacking, just attacking the home because it was in the neighborhood that was being held by minority groups? Then they... I mean, where does he get to ask the question and where does he answer in a way that suggests that they did it because he was a minority group? Well, on account... See, that's the thing about asylum. You have to show... You have to show that whatever he suffered was on account of that rather than for some other reason. Yes, Your Honor. People get hurt all over the world all the time for all sorts of reasons. Yes, Your Honor. They're not all eligible for asylum. Anyway, so this is one place. Where else? Further on there, he also says, now these people that came looking for you, then they were looking for you because they knew you personally. Yes, they knew. They knew us personally, and so forth. Then on pages 168 and 169, he talks about the fact that he used to work for a garage as a welder. In that garage, they used to fix government cars. Again, the people who attacked him knew that he worked for that garage as a welder where they were repairing government cars. Okay. What does that tell you? Your Honor, this again tells me that he was attacked by the USC because of his belonging to the Madaman, because of his working for a garage which the USC believed was working in cahoots with the government. Again, this is not an example. So the influence here would be they were after him because, I mean, he doesn't say because of us. He doesn't just say they knew me as the guy who did this. He doesn't say that's why they did it. No, Your Honor, he does not say that's why they did it. So if we sort of read the because in there, the reasoning would be you're a guy who works in a garage that fixes government cars, and therefore they must have imputed to you that you were aligned with the government. Yes, Your Honor. That's a different reason than he gave on supposedly on page 68 where he says it's because of his Klan status. Yes, Your Honor. It's not a completely different reason. All of this evidence supports the finding that these people attacked him. It's a different reason. You could be a member of a Klan and not work for the government. You could be a member of the government and not work for the Klan, right? Yes, Your Honor. So they are different reasons. They are different reasons, but you have to take them as a totality. This is a person who's testifying to the fact that his neighbors knew which Klans he belonged to. Mr. Yancey. I understand you have to consider both these, but they don't mutually reinforce each other because they don't have anything to do with each other. So it's not like he says here, you know, one thing, and then he says, and also, you know, all the people in my Klan work for the government as garage or anything like that. These are two sort of unrelated facts, both of which you've believed if he, you know, that that was really the reason, could provide the basis for a sign, independent. They could independently provide a basis for it. There's no particular connection between them. Two points, Your Honor. First, they are both independent grounds because if they attacked him because he was helping the government, then it could be for his political beliefs. Second, Your Honor, the testimony and the state reports show that the Madhavan did work for the government in sort of lower position jobs, such as welders. So the State Department reports confirm that that's the position they would hold. Are you telling us he shouldn't be worse off because there are two possible reasons? Is that essentially what you're saying? Your Honor, that's correct. This Court has held. If you're saying that, then you're really saying something totally trivial because that's not the question I asked. The question I asked is whether there's anything about the two reasons that reinforce each other. Yes. That's the question I was asking. I mean, he has two reasons. And something that does, Your Honor, I would like to reserve some time for rebuttal. Can I finish this? A minute and a half left. As much as you want to go. Your Honor, they do reinforce each other because there is facts in the record. There are State Department reports in here that talk about the fact that Madhavan worked as welders and that they worked supporting the government in low-level jobs. The fact that they knew that he worked for a government garage would be further evidence that they knew that he was Madhavan and attacked him for that reason. But he never says in either place that they did it because of this. Your Honor, he says that at the very beginning when he's talking about being attacked on pages 122 through 125. Well, let's see what he says there. It's actually on page 123, Your Honor. He talks about his house being bombed and being attacked. And that's when they say, when he's asked, and why were they after you? Because I'm one of the smallest tribes in Somalia. And what tribe was that? Madhavan. And why were these people after Madhavan? The reason they attacked Madhavan? Because the rebels, they believed the small tribe were part of the government. That's when he's talking about specific general persecution. But when he comes to the actual specific things that he claims were done to him, he doesn't tie it up. No, this is actually where he's talking about what happened. He also says on page 122, when the government collapsed. 123, Your Honor. That's when the 122, he says, when the government collapsed and the rebels, the rebels, they took out everything. Your Honor, I respectfully disagree. If I can just finish. May I answer this question because I'm about to run out of time? You actually are out of time. What do you say about what he says here on 123? On 123, he says. What is he on 122, what he says? On 122, he's talking about general conditions. On 123, he's asked, what happened to you? He says, when the government collapsed and the rebels, the rebels, they took out everything. They broke everything. And that's when he's talking about. People that tried to destroy and kill everybody, including the people against them and also the people who used to be with the earlier government. Your Honor, that's when he's talking generally about the country conditions. Right after that, he's asked, did anything dramatic happen to you and your family and any member of your family? That's on 122. His response is on 123. That's when he talks about, what happened to you? How badly were you hurt? The people attacked my house. They knocked the door first. And we knew that these people were going to kill us. We refused to open the door. Who were these people? The USC troops. What does USC stand for? So on. And then, continuing that conversation a few lines down, he's asked, and why were they after you? Because I'm one of the smallest tribes in Somalia. What tribe was that? Madhavan. And why were these people after the Madhavan? Because they thought we were with the government. And are these the people that blew up his house? These are the people who blew up his house. The specific individuals? These specific individuals. Where does he tie that up? He says, right at the beginning of that page, after two days when the war broke out, some people attacked my house and my brother was killed. I was hurt. And the same night, I ran away from home. What happened to you? So on. He's talking specifically about the individuals who attacked his house. He identifies them as the USC. In his declaration, he talks about the fact that they threw a bomb into his house. His brother's body was cut to pieces. His leg was injured. He talks here also about the fact that his leg was injured and he managed to escape through a back window. And in that testimony, he's talking specifically about the USC attacking him because he is a member of the Madhavan. This is not a general country, general statement about civil unrest. Okay. Thank you. We'll hear from the government. Good morning. May it please the Court. Kristen Johnson on behalf of the United States. I would like to first start by addressing exactly what issues are before the Court because I'd specifically like to address the Petitioner's argument that he is not required to exhaust his claim that he did not receive a full and fair hearing before coming to this Court. Part of the main crux of Petitioner's claim is that he didn't receive a full and fair hearing because the immigration judge was not a neutral fact finder and because the immigration judge did not allow him to present some evidence. And he cloaks those arguments in a due process claim that those arguments were not exhausted before the BIA. This Court has clearly held that an alien in deportation proceedings is entitled to due process, and the government does agree they're not allowed to submit evidence. But if you have a claim that you were not in front of a neutral fact finder or you were not allowed to submit evidence, you must submit that claim to the BIA before your petition for review. In this case, it was not submitted to the BIA. If you look at the actual brief that was before the BIA, and that's at the record 43 through 48, the only allegations raised deal with the I.J.'s, the immigration judge's, credibility finding and an allegation that the government attorney was allowed to testify. The BIA was not allowed to correct these types of abusive discretion or procedural problems below, so they are not right for review up here. And I briefly want to address the Petitioner's argument that, well, actually, the BIA did address them because you can see it in the BIA's decision, and that's at page 33. I have more of a problem with the credibility finding than with the alleged due process problem. I wasn't going to expect you to waste much time on that. But on the credibility finding, it reads a little bit as if she was a – I.J. was picking on rather trivial kind of inconsistencies that occur all the time in these cases and that didn't seem to shake his credibility as much as one would have expected. Let me address that, Your Honor. I also, when I read the immigration judge's decision, it's a 33-page decision, and there are a lot of reasons that are thrown out there to challenge the Petitioner's credibility. I – the government can see that some of those reasons do not appear to be supported by the record and do not appear to actually go to the heart of the asylum claim. But there are several that do, and this Court has held that as long as there is one reason that's either – What's the best one? The best one is his life in Kenya and his brother's-in-law. Here, the Petitioner testified that he lived – He didn't have the information about how he could reach them? Not specifically that, but that's tied into it. He testified that he lived in Kenya for nine years in Kenya. He fathered four children while he was there, and he supported a family of 11. He also testified – the contradiction comes in where he says – and I think it went to his firm reestablishment claim. He says, I wasn't accepted in Kenya. I couldn't work there. I didn't have any papers there. And the judge is looking at this other testimony that for nine years he was able to have four children, support a family of 11, and then at another part in the record he testifies, I was able to work, my wife was able to work, but there's no testimony. And then he comes up with $6,000 to come to the United States. Right. And the question arises, where does he – how does he come up with $6,000 if he's just a dishwasher or not? And the story that he comes up with is that brothers-in-law in Saudi Arabia have wired him money, he and his family money, in Kenya every month for the past nine years. And when he's asked – and this is questioned by the government attorney – he's asked, do you have the names of your brothers-in-law, where they live, where they work, where they're telephoned, how did you contact them? And the explanation that he gave, the judge didn't find credible. The explanation was, we never contacted them, they just contacted us. So I never had their phone number. And then the judge does go on to say, as you're on our address, that there isn't any corroborating evidence from these family members. And I do understand that these family members are in Saudi Arabia, but there's evidence in the record to show that that corroborating evidence could have been – was material, was not duplicative, and could have been easily obtained. The Petitioner testified that he spoke to his wife, who still resides in Kenya with his nine children, for every two months. Every – once every two months, he spoke to her by telephone. And he also testified in another point in the record that she had a way of communicating or contacting with her brothers-in-law. There was evidence there to support the immigration judge's finding that the corroborating evidence could have been easily obtained, that it was material. And in those cases, this Court has held that – And the inference, I guess, to be drawn is that if he can't come up with contact information for these guys who keep sending him money every month, or kept sending him money every month, maybe he made up that story. The IJ family? And let's say he did make up that story. I mean, that's the inference. He can't come up with it because there are no brothers there, and this is just an invention. And how does that go to the heart of his asylum claim? It goes to the heart of his asylum claim because he claimed that he had to flee Somalia and go to Kenya because of the past persecution or the fear of persecution. And I believe it technically goes to the firm reestablishment because there's evidence in the record that he's in Kenya for nine years, and he also puts in a declaration that in Kenya, that was the place where he obtained the most peace and safety – I don't know if I have that quote for you – that he'd experienced in his life. But his answer is that he's illegal there. He can't really work. And you're saying, what, that if there are no brothers in law there, I mean, how exactly does this tie into the firm reestablishment claim? I don't think it ties into his – I think it ties into the firm reestablishment because he's saying, I was not accepted by that country. I had to come to the United States. I had no other choice. I don't think it actually ties back into his fear of persecution back in Somalia, but it goes to his entire story that he had to flee, he had to go to Kenya, and he couldn't stay there. He had to then get $6,000 and be smuggled into the United States. That's the strongest credibility argument in the record. Assuming we don't – so that destroys or, you know, undermines his credibility, and then the I.J. can disbelieve other aspects of the story as well. That's what you're arguing, right? It is what I'm arguing. I'm just deferring you along just because you're out of time. But let's say we look at this and we are not convinced that I.J.'s credibility findings were supported. Does he make a showing of persecution? If the court finds that the credibility findings aren't supported, the court should remand it for further findings. There is not sufficient evidence in the record to meet the findings of asylum. Why wouldn't we simply – if there's not sufficient evidence, why wouldn't – even if he's believed, why wouldn't we simply deny the petition? Well, I think in all honesty, if the court finds that the credibility finding is not justified, supported, the court has to find the testimony credible. Right. I should move my testimony credible. If the court finds the testimony credible, he's testified that there was past persecution, that he has a well-founded fear of persecution. But then the burden switches to the government to rebut the presumption of – So you are conceding that if we believe his story, what he told, he sufficiently tied up to a – what he suffered to a protected ground, that he would have established persecution? No, I'm not. I'm sorry. There are two views of the evidence on that. The judge took the view, as this Court indicated, that there were robbers and that civil unrest erupted as a result of the war, and that there was no evidence in the record – she said it two different times in her opinion – that he was persecuting I'm aware that that was an alternative ruling, and that's why I asked you the government's position on this. Is the government's position that even if we believe the petitioner's story, he has not shown persecution in accord with what I did, or do we have to be meant for a redetermination on that issue? The Court should accept the immigration judge's finding that he was not persecuted because of or account of his membership in that clan. So we reject – we reject then the immigration judge's determination on credibility, but somehow we credit what the same immigration judge has done on the other aspect. Is that right? I don't think it's improper to find that one aspect of it. But that's your position, right? That's correct. Sorry, Your Honor. Okay. But it's a different kind of review, right? We would then take a look and see whether that finding is supported. Correct. Whether – and if there are two permissible views of the evidence and her findings supported by substantial evidence by the record, then yes. Thank you. We'll give you a minute for rebuttal. Your Honor, to address two points made by the government. First, the issue of his life in Kenya. He didn't testify that he lived there for nine years supporting himself. Testified that for the first two and a half years he was living in a U.N. refugee camp, and that's where he was able to support himself. Then he moved to Mogadishu where he worked as a dishwasher. He then moved to Nairobi and worked at a dishwasher. Moved to Nairobi, right. And he worked as a dishwasher and was getting money from these guys. Right. And in Ali v. Ashcroft, Your Honor, same exact fact pattern where the person fled from Somalia to Ethiopia, and there this court recognized that there was nothing inconsistent with saying that he didn't have firm resettlement but there Ms. Ali was able to support herself for five years working under the table as a housemate. But it does go to the question of whether he was working under the table. If he is, in fact, not getting support from the brothers-in-law in Saudi Arabia, if he's managing to get thousands of dollars to come to the United States, that suggests that he's not working under the table, that maybe he's well-established in Kenya. Your Honor, I don't see. He did not come up with any information about the brothers-in-law. Yes, he did. He named the brother-in-law. He says his brother-in-law is named Ahmed Eksine. He says that he lives in Jeddah. He says that he works for a company that makes cookies. I understand. This is all his story. I mean, the question is he didn't come up with any documentary proof of that. He didn't come up with any letters, any telegrams. He didn't come up with a phone number that could be called to verify anything like that. Doesn't that seem strange for somebody who's been getting money from these people for nine years? No, Your Honor, it doesn't because it's consistent with his testimony. First of all, he wasn't getting money from them for nine years. There's nothing in the record to indicate that. At most, he got money from them for about six years. Second, what he testified to was these brothers-in-law contacted them. They always initiated the contact, sent them the money, that he never had their phone numbers. That's in the record. So it doesn't seem strange. This Court has repeatedly said that he never sends a thank-you note. These people just send money for years, and he doesn't acknowledge receipts. They don't even know how much money he needs. How do they know that he needs $6,000 to go to America? Your Honor, there's a big difference. How do they figure that one out? Well, they probably talked about it on the telephone. He does say they talk on the telephone, and the brothers-in-law initiate the— So they call him all the time, but he doesn't have a number to call him back. Yes, Your Honor. That is his testimony, and that is consistent with his testimony about how he contacts his wife after he comes to the United States. He calls the neighbor, and the neighbors go and get his wife, and then he talks to her on the phone. But he has a number for the neighbors. He has a number for the neighbors, but he doesn't have a number for the brothers-in-law because he's never called the brothers-in-law. The brothers-in-law, just like he calls the neighbors, likely called the same neighbors, and they went and got his wife. And his wife could have told them, look, we need $6,000 to get my husband to the United States. He doesn't have a note from the neighbors saying, we keep getting these calls from Saudi Arabia. Excuse me, Your Honor. He doesn't have a note from the neighbors saying they're getting calls from Saudi Arabia. No, Your Honor, he does not have a note from the neighbors saying that. Okay. Thank you. Judge Estrada, you'll stand for a minute.
judges: Goodwin, Kozinski, Shadur